IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MATTHEW P. ZULICK,**<br>         Plaintiff,<br><br>         vs.<br><br>**JOANNE B. BARNHART,**<br>**COMMISSIONER OF SOCIAL**<br>**SECURITY,**<br>         Defendant. | )<br>)<br>)<br>)   2:05cv381<br>)   **Electronic Filing**<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

June 27, 2006

### I.     INTRODUCTION

Plaintiff Matthew P. Zulick brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his applications pursuant to the Social Security Act ("Act") for, respectively, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). As is the customary practice in the Western District of Pennsylvania, the parties have submitted cross-motions for summary judgment on the record developed at the administrative proceedings.

After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the memoranda of the parties, and the entire record, the Court finds that the decision of the Commissioner is not supported by substantial evidence and therefore will deny the Commissioner's motion for summary judgment and grant Plaintiff's motion for summary judgment.

### II.    PROCEDURAL HISTORY

Plaintiff protectively filed for SSI and DIB on August 12, 2002, alleging disability as of December 31, 1999, due to chronic back problems, sleeplessness and depression. (R. 66). The applications were denied by the state agency on January 23, 2003. (R. 29-32). Plaintiff requested a hearing, and one was held before Administrative Law Judge David G. Hatfield on June 28, 2004. (R. 33, 293). Testimony was given by Plaintiff, who was represented by counsel, and by a vocational expert. (R. 293-325). On August 24, 2004, the ALJ issued a decision in

which he determined that Plaintiff was not disabled within the meaning of the Act. (R. 13-19). Plaintiff's request for review was denied by the Appeals Council on February 2, 2005, thereby making the ALJ's decision the final decision of the Commissioner. (R. 5-8).

Plaintiff commenced this action by filing a complaint in this Court on February 28, 2005. Plaintiff filed a motion for summary judgment on July 13, 2005, pursuant to Federal Rule of Civil Procedure 56. The Commissioner filed a motion for summary judgment on August 12, 2005.

### III.  STATEMENT OF THE CASE

Plaintiff was evaluated by Sean Collins, a physical therapist, on March 7, 1996. (R. 147-149). This evaluation was in the aftermath of a motor vehicle accident on January 24, 1996. (R. 147). Plaintiff complained of mid-thoracic discomfort, and the physical therapist was left with the impression that he had suffered a mid-thoracic sprain. (R. 147-149). At the time, Plaintiff described the symptoms as "decreasing." (R. 147).

Dr. Dennis M. Demby, M.D., became Plaintiff's primary care physician at some point in 1998. (R. 189). After feeling pain in his back while at work on July 2, 1998, Plaintiff went to the emergency room on July 6, 1998. (R. 197). Plaintiff was referred to Dr. Nallathambi, who told him that he should not work for the time being. (R. 197). After learning from his employer that he could choose to see any medical provider, Plaintiff saw a chiropractor. (R. 197). Apparently, his condition did not improve. (R. 197). After receiving treatment from Dr. Demby repeatedly for two months, Plaintiff was medically cleared to go back to work "without restrictions" as of September 9, 1998. (R. 190). Nevertheless, he was advised to wear back supports. (R. 190). In June, 1999, Plaintiff sought treatment from Dr. Demby for acute gouty arthritis, which was considered to be a "familial" problem. (R. 77).

On July 18, 2002, Plaintiff went to Butler Memorial Hospital, complaining of chronic neck and back pain resulting from "no known injury." (R. 94). Plaintiff subsequently resumed treatment with Dr. Demby on July 30, 2002, claiming that the neck and back pain had started nine years earlier after motor vehicle accidents and a work-related injury. (R. 100). At the time,

2

Plaintiff told Dr. Demby that he had been forced to quit working due to the chronic pain, but that he had taken no specific steps to improve his condition. (R. 100). Dr. Demby noted that Plaintiff had "full range of motion with pain on all end motions," in both his neck and his back. (R. 100). On August 15, 2002, Plaintiff again saw Dr. Demby, who was left with the impression that Plaintiff was suffering from cervical and lower back pain. (R. 99). While visiting Dr. Hugh Shearer on September 23, 2002, Plaintiff was put on Naprosyn and Flexeril. (R. 97). He had already been taking Restoril for sleep and Vicodin ES for pain. (R. 99). Plaintiff was also referred to a chiropractor. (R. 97). From August 5-September 30, 2002, Plaintiff received physical therapy. (R. 103-121). Following the initial visit, therapist Richard McCandless reported that Plaintiff was "[u]nable to perform typical manual labor secondary to acute pain in thoracic area." (R. 119).

On October 9, 2002, Plaintiff underwent an MRI of the cervical spine. (R. 101-102). The MRI revealed that Plaintiff had "mild asymmetric medial foraminal osteophytes" at the C5-6 level, which was "greater on the right with mild concomitant bulging of disc." (R. 101). It was also noted that there was "no evidence of spinal stenosis." (R. 101). Less than a week later, Plaintiff was seen by Dr. Joseph Nour. Dr. Nour was left with the impression that Plaintiff had "a longstanding history of upper back pain located between his scapulae," but he nevertheless noted that Plaintiff was "able to move his neck in all directions with no limitations." (R. 256).

On December 10, 2002, Dr. Demby completed a form for the Department of Housing and Urban Development verifying that Plaintiff was disabled and would need special accommodations. (R. 187-188). Two days later, an agency medical expert who reviewed Plaintiff's medical records opined that Plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, and sit, stand or walk for about six hours in an 8-hour workday. (R. 137). Plaintiff's abilities to push and pull were deemed to be unlimited, and no postural, manipulative, visual, communicative or environmental limitations were found. (R. 137-140). Plaintiff's statements were determined to be "partially credible." (R. 141).

Dr. Demby saw Plaintiff on March 26, 2003, noting in the examination report that Plaintiff had chronic pain in the right shoulder and back. (R. 180). On that occasion, at the

3

request of Plaintiff's attorney, Dr. Demby completed a Physical Capacity Evaluation form. (R. 180-184). It was noted that Plaintiff, in an 8-hour workday, could sit for three hours, stand for two hours, and would need to lie down for five hours. (R. 181-182).

On September 24, 2003, Plaintiff saw Dr. Francis T. Ferraro, a neurosurgeon, after being referred by Dr. Demby. (R. 170-171). In a letter to Dr. Demby, Dr. Ferraro reported that Plaintiff had "limited range of motion of the cervical and lumbar spine." (R. 170). A thoracic MRI scan was ordered, which turned out to be normal. (R. 171, 204).

Plaintiff was subsequently referred to Dr. Ellen Mustovic, a rehabilitation specialist, who examined him on November 12, 2003. (R. 221-222). Dr. Mustovic relayed to Dr. Demby her view that Plaintiff was suffering from "degenerative disc disease and degenerative arthritis." (R. 223). She recommended that Plaintiff begin a water therapy program. (R. 223). She also indicated that she and Plaintiff had discussed the option of retraining him, and that he was interested in the computer field. (R. 223).

In February, 2004, Plaintiff was seen by more specialists. On February 5, he received a cervical epidural steroid injection, which was administered by Dr. Nisantiia M. Banda of Office Based Anesthesia Solutions, Inc. (R. 247). The procedure was repeated one week later by Dr. Frank Kunkel, and then again on April 8, 2004. (R. 245). Dr. Kunkel reported that Plaintiff had "exacerbation of his pain with turning his head to the extremes of right and left," but that "his motor and sensory of upper extremities [were] grossly intact." (R. 244). On February 24, 2004, Plaintiff was examined by Dr. Joseph A. Wapenski, who diagnosed Plaintiff as having chronic pain syndrome. (R. 239). Dr. Wapenski, in a letter to Dr. Kunkel, reported being suspicious that the problem was the result of a hematologic disorder. (R. 239). An MRI scan of Plaintiff's brain was ordered, but no abnormalities were found. (R. 234-239). Dr. Wapenski also noted that Plaintiff had "fairly good range of motion" in his neck, even though he may have had "some muscle spasm occipitally." (R. 239).

Plaintiff was later referred to Dr. Matt El-Kadi, who examined him on March 11, 2004. (R. 268). In a consultation report sent to both Dr. Kunkel and Dr. Demby, Dr. El-Kadi relayed Plaintiff's view that while aqua therapy had not helped him, he had received some temporary

4

relief from seeing a chiropractor and from epidural steroid injections in his cervical spine. (R. 268). Dr. El-Kadi did not recommend surgical intervention, but he did arrange for Plaintiff to have EMG nerve conduction studies. (R. 269). These studies "showed no evidence of radiculopathy." (R. 264). It was noted that if improvements were not shown within six weeks, "a C5-6 anterior cervical disectomy with fusion and plating" would be considered. (R. 269). Plaintiff saw Dr. El-Kadi again on May 6, 2004, at which point a new MRI of his cervical spine was ordered. (R. 265). The MRI, which was performed six days later, indicated that Plaintiff had "[e]arly degenerative disc disease at least at C5-6." (R. 249). Minor central disc bulges were found at C4-5 and C5-6, but the MRI was otherwise normal, "with no evidence of disc herniation or spinal stenosis." (R. 249). Dr. El-Kadi reevaluated Plaintiff on May 21, 2004, telling him that he may be a candidate "for placement of a morphine pump." (R. 264). Plaintiff declined that option. (R. 264). Dr. El-Kadi indicated that there was nothing that he could offer Plaintiff "in the way of neurosurgical intervention for resolution of his symptoms." (R. 264).

In June, 2004, Dr. Demby completed another form. (R. 270-272). He indicated that, in an 8-hour workday, Plaintiff could sit for three hours, stand for two hours, sit and stand for five hours, and would need to lie down for three hours. (R. 270-271). It was further noted that Plaintiff could lift up to five pounds, and perform simple grasping tasks, with his right hand, and that he could use his feet "for repetitive movements as in operation foot controls." (R. 271).

Plaintiff was examined by Dr. Thomas D. Kramer on June 22, 2004. (R. 292). No sensory deficits were detected, but he was diagnosed as having degenerative disc disease in his cervical spine. (R. 292). Dr. Kramer did not find Plaintiff to be a candidate for back surgery. (R. 292). Nevertheless, less than a month later, Plaintiff had surgery to remove his gallbladder. (R. 283). The procedure was performed on July 16, 2004, at Butler Memorial Hospital. The surgeon was Dr. Roger Althoff. (R. 283-286). The surgery was done because Plaintiff had been diagnosed as having "[s]pherocytosis with hemolysis," in addition to "[s]ymtomatic gallbladder disease with sludge in the gallbladder itself." (R. 284).

At the hearing, Plaintiff testified that he was born on September 22, 1966, and that he was 37 years old at the time of the hearing. (R. 297). Plaintiff further testified that his driver's

license had been suspended (R. 299), that his attorney had driven him to the hearing (R. 299), that he had completed high school, and that he had attended college for about a year and a half. (R. 300). He worked as a truck driver. (R. 300). He testified that his first driving job involved "hauling scrap steel in and out of different steel mills and different scrap yards," and that he had to do some lifting and tugging to fulfil his duties. (R. 300). Approximately 70-75 percent of his time was spent inside the cab. (R. 301). Plaintiff testified that he left that job because of his back condition. (R. 301). He worked at "the Sprinkler" for a few months, but that job apparently "didn't work out" for him. (R. 301). Subsequently, Plaintiff worked as a truck driver for Service Star, which eventually went out of business and merged with True Value Hardware to form True Service. (R. 302). While employed on that job, Plaintiff sometimes had to unload "a whole trailer" of hardware freight by hand. (R. 302). Plaintiff testified that he left that job, as well as a laboring job, because of problems that he was having with his back and his right shoulder. (R. 302). He explained that he could not work because his back and neck kept him in constant pain and misery, and because his sleeplessness prevented him from getting adequate rest. (R. 303). Although he said that his left side was "fine," he contended that his right side would become aggravated if he tried to write. (R. 303-304).

When asked about the various medications that he was taking, Plaintiff claimed that they made him tired and drowsy. (R. 308). He testified that the epidural steroid shots that he received had provided only temporary relief. (R. 308-309). He contended that his pain prevented him from doing things like looking up, holding up his arms, hunting and fishing. (R. 310-312). Plaintiff did state that he did his own cooking. (R. 311). When questioned by his attorney, Plaintiff claimed that the pain in his neck would sometimes spread throughout the rest of his body, and that he was experiencing roughly three headaches per month. (R. 317-318). He testified that he received assistance when he went grocery shopping, and that his condition often forced him to lie down for significant periods of time. (R. 318-319).

Dr. William H. Reed, a vocational expert, also testified at the hearing. (R. 320-324). Dr. Reed was asked whether someone of Plaintiff's age, education and work experience, with the applicable limitations in place, could perform the past relevant work described in Plaintiff's

testimony. (R. 321-322). Dr. Reed was asked to assume that the employee was limited to light work, was unable to engage in "overhead reaching" or "frequent pushing and pulling of arm controls," and was unable to frequently use his arms for lifting and carrying. (R. 321-322). Based on that hypothetical, Dr. Reed testified that someone in Plaintiff's situation could not do any of the "past relevant work" described in Plaintiff's testimony. (R. 322). Nevertheless, he indicated that such an individual could perform driving jobs in which the driver was not permitted to load or unload anything, and that there were 310,820 such jobs existing in the national economy. (R. 322). Other compatible categories included ushers, guides, and unskilled security guards. Dr. Reed testified that 45,000 usher/guide jobs existed in the national economy, and that 35,421 light and unskilled security guard jobs existed in the national economy. (R. 323).

The ALJ proceeded to ask Dr. Reed whether his answer would have been different if the same hypothetical employee, in an 8-hour workday, had to lie down for three hours, could only sit for three hours, and could only stand for two hours. (R. 323). Dr. Reed stated that his answer would have been different if that condition had been added. (R. 323). When asked to assume that the same hypothetical employee could sit or stand for the entire day, but that he would be absent from work for one day each week, Dr. Reed stated that such a degree of absenteeism would have been "well beyond the employer tolerance." (R. 323). He described "the employer tolerance" as the rough equivalent of one absence per month. (R. 323).

The ALJ stated his findings as follows:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.[1]

3. The claimant has an impairment or a combination of impairments considered "severe" (20 CFR § 404.1520(b) and 416.920(b)).

4. These medically determinable impairments do not meet or medically equal one of

---

[1]Even though Plaintiff posted earnings subsequent to his alleged onset date, the ALJ concluded that those earnings constituted "unsuccessful work attempts." (R. 14). Consequently, Plaintiff was able to proceed beyond the first step of the sequential evaluation process.

        the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.     The undersigned finds the allegations regarding the claimant's limitations are not totally credible for the reasons set forth in the body of the decision.

6.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527 and 416.927).

7.     Mr. Zulick has the residual functional capacity for light work not requiring overhead reaching, frequent pushing and pulling of arm controls, or frequent use of the arms for lifting and carrying.

8.     The claimant is unable to perform any past relevant work (20 CFR § 404.1565 and 416.965).

9.     The claimant is a "younger individual" (20 CFR § 404.1563 and 416.963).

10.    The claimant has more than a high school education (20 CFR § 404.1564 and 416.964).

11.    The claimant has no transferable skills from work previously performed as described in the body of the decision (20 CFR § 404.1568 and 416.968).

12.    The claimant has the residual functional capacity to perform a significant range of light work.

13.    Although the claimant's limitations do not allow the claimant to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that the claimant could perform.

14.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f) and 416.920(f)).

(R. 18-19).

## IV. STANDARDS OF REVIEW

    42 U.S.C. § 405(g) states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive..." In <u>Rutherford v. Barnhart</u>, 399 F. 3d 546 (3d Cir. 2005), the U.S. Court of Appeals for the Third Circuit defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Rutherford</u>, 399 F. 3d at 552. In this regard, substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." <u>Rutherford</u>, 399 F. 3d at 552. This Court has no mandate to re-weigh the evidence or to substitute its own conclusions for those of the fact-finder. <u>Rutherford</u>, 399 F. 3d at 552.

When resolving the issue of whether a claimant is disabled and therefore entitled to DIB or SSI benefits, the Commissioner uses a five-step sequential evaluation process. The U.S. Supreme Court recently summarized this five-step process as follows:

> "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c)."

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

## IV.  DISCUSSION

In this case, the ALJ determined, at step five of the sequential evaluation process, that Plaintiff had "the residual functional capacity for light work not requiring overhead reaching, frequent pushing and pulling of arm controls, or frequent use of the arms for lifting and carrying," and that there were a significant number of jobs existing in the national economy that Plaintiff could perform. (R. 19). Plaintiff contends that the ALJ erred in three distinct ways. First, he claims that the ALJ improperly disregarded the medical opinions expressed by his primary care physician. (Br. for Plaintiff 11). Secondly, Plaintiff asserts that the ALJ erred in finding that he had the capacity to perform light exertional work with the restrictions described above. (Br. for Plaintiff 15). Plaintiff's third and final contention is that the ALJ improperly disregarded a portion of the vocational expert's testimony, thereby relying on the answer to an incomplete hypothetical question as the basis for his decision. (Br. for Plaintiff 16). Because the first two arguments advanced by Plaintiff are interrelated in both content and reasoning, this Court will proceed to address them together.

Plaintiff's primary care physician, Dr. Demby, twice completed Physical Capacity

Evaluation forms in which he indicated that, in an eight-hour workday, Plaintiff could sit for a total of only three hours, stand for a total of only two hours, and would need to lie down for at least three hours. (Br. for Plaintiff 11; R. 180-184, 270-272). Prior to both of these assessments, Dr. Demby completed a Verification of Disability or Handicap form for the Department of Housing and Urban Development indicating that Plaintiff was disabled. (R. 187-188). The form clearly stated that "HUD's definition of disabled requires that the individual be 'unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.'" (R. 187). This definition is identical to that found in 42 U.S.C. § 423 (d)(1)(A). It is also worthy of note that the HUD form contained a notice that 18 U.S.C. § 1001 made it "a criminal offense to make willful false statements or misrepresentations to any Department or Agency of the United States as to any matter within its jurisdiction." (R. 188). Dr. Demby completed the HUD form on December 10, 2002, the first Physical Capacity Evaluation form on March 26, 2003, and the second Physical Capacity Evaluation form on June 25, 2004. (R. 180-184, 187-188, 270-271). In all, the period of time throughout which Dr. Demby contended that Plaintiff was disabled spanned eighteen months. The limitations described on the two Physical Capacity Evaluation forms were consistent even though they were completed fifteen months apart.

    Plaintiff contends that the ALJ was required to give controlling weight to Dr. Demby's conclusions because of his status as Plaintiff's primary care physician. (Br. for Plaintiff 14). On this point, the Court disagrees with Plaintiff. The Commissioner relies on the language of 20 C.F.R. § 404.1527(d)(2), which states that "controlling weight" is given to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairments" only where that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). On December 12, 2002, an agency medical expert who reviewed Plaintiff's medical records recorded findings which differed from those later recorded by Dr. Demby. (R. 137-143). The expert concluded that Plaintiff's statements were only "partially credible." (R. 141). As the U.S. Court of Appeals for the Third Circuit explained in

Plummer v. Apfel, 186 F. 3d 422 (3d Cir. 1999), "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F. 3d at 429. Consequently, this Court rejects Plaintiff's contention that the ALJ was required to give Dr. Demby's opinion controlling weight.

     A conclusion that the Commissioner need not accord controlling weight to a treating physician's opinion, however, does not end the inquiry. As the Court of Appeals stated in Plummer, "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Plummer, 186 F. 3d at 429, citing Rocco v. Heckler, 826 F. 2d 1348, 1350 (3d Cir. 1987). 20 C.F.R. § 404.1527(d)(2)(i)-(d)(6) explains that opinions conveyed by a claimant's treating physician are entitled to more weight than those expressed by nontreating physicians. This is because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." Fargnoli v. Massanari, 247 F. 3d 34, 43 (3d Cir. 2001). An ALJ may not reject the findings of a treating physician "unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." Mason v. Shalala, 994 F. 2d 1058, 1067 (3d Cir. 1993). "Where there is conflicting probative evidence in the record, [there is] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions." Fargnoli, 247 F. 3d at 42.

     In the instant case, as Plaintiff points out, the ALJ never acknowledged Dr. Demby's March 26, 2003, report listing Plaintiff's limitations. (Br. for Plaintiff 14). The ALJ specifically discounted Dr. Demby's similar report of June 25, 2004, without explanation, thereby passing it off as if it were an isolated clerical aberration. (R. 17). This report, when considered in context with the earlier one, appears to have reflected Dr. Demby's consistent opinion over the course of a fifteen month period. It is unclear whether Dr. Demby's first report was even considered, and it

11

is likewise unclear whether the conflicting report of the agency medical expert was relied upon by the ALJ to discredit Dr. Demby's first report to the same extent that it was relied upon to discredit Dr. Demby's second report. "The ALJ [made] no mention of any of these significant contradictory findings, leaving [this Court] to wonder whether he considered and rejected them, considered and discounted them, or failed to consider them at all." Fargnoli, 247 F. 3d at 43-44. Consequently, this Court has no choice other than to reverse the final decision of the Commissioner and to remand this case for further proceedings consistent with this opinion and the applicable controlling precedents.

      This Court is mindful of the fact that the U.S. Court of Appeals for the Third Circuit, in Mason v. Shalala, 994 F. 2d 1058 (3d Cir. 1993), stated that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." Mason, 994 F. 2d at 1065. It is also clear that Dr. Demby's report of March 26, 2003, was prepared at the request of Plaintiff's attorney. (R. 184). Plaintiff cites Lester v. Chater, 81 F. 3d 821 (9th Cir. 1995), a noncontrolling precedent from the Ninth Circuit, for the proposition that the opinion of an examining physician, even if contradicted by the opinion of a non-examining physician, "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." (Br. for Plaintiff 15), citing Lester, 81 F. 3d at 830-831. It is worthy of note that the U.S. Court of Appeals for the Ninth Circuit distinguished and limited its prior decision in Lester just nine months later. In Saelee v. Chater, 94 F. 3d 520 (9th Cir. 1996), the Court of Appeals explained that the ALJ was permitted "to question a doctor's credibility because, as here, the doctor's opinion letter had been solicited by the claimant's counsel." Saelee, 94 F. 3d at 523. In Burkhart v. Bowen, 856 F. 2d 1335 (9th Cir. 1988), a prior Ninth Circuit precedent, the Court had described the ALJ's questioning of the doctor's motives as "a permissible credibility determination given the evidence before the ALJ." Burkhart, 856 F. 2d at 1339. In Lester, the Court stated that "[t]he purpose for which medical reports are obtained does not provide a basis for rejecting them." Lester, 81 F. 3d at 832. The Court explained in Saelee that the language in Lester had been limited to the facts of that case, given the fact that Burkhart had already been decided and was, therefore, a precedent binding the Lester panel. Saelee, 94 F.

3d at 523.

In making these observations, this Court does not mean to suggest that Dr. Demby's reports are not credible. Instead, this Court is merely reiterating the fact that, where medical evidence is in conflict, it is the job of the ALJ to weigh that evidence. It is certainly possible that the opinions expressed by Plaintiff's treating physician can be outweighed by other evidence in the record. Newhouse v. Heckler, 753 F. 2d 283, 286 (3d Cir. 1985). What is impermissible, however, is the dismissal of a treating physician's findings even in the absence of a comprehensive review of those findings. The ALJ's statement that Dr. Demby's report was "not supported by the medical record, including the doctor's own treatment notes," apparently refers only to the report of June 25, 2004. (R. 17). As noted earlier, the ALJ never referred to the earlier report of March 26, 2003. It is unclear whether the "treatment notes" discussed in the ALJ's opinion include only the information recorded on July 25, 2004, or include all of the relevant treatment information recorded during the fifteen months between the two reports. Since the ALJ apparently ignored the earlier report, this Court cannot assume that the ALJ properly considered all of the treatment notes recorded between March 26, 2003, and June 25, 2004.

The ALJ appears to have placed much reliance on Plaintiff's ability to do "household chores such as cleaning, washing dishes, doing the laundry, and cooking for himself." (R. 16). The ALJ likewise noted that Plaintiff, at the hearing, "did not manifest any outward signs of side effects of medications, or the effects of pain of the severity to significantly compromise his abilities to concentrate, remember, and meet the other basic mental demands of work." (R. 17). Nevertheless, the Court of Appeals explained in Frankenfield v. Bowen, 861 F. 2d 405 (3d Cir. 1988), that the Commissioner is not free to reject "medically credited symptomatology based solely on the administrative law judge's observation of the claimant at the hearing, and claimant's testimony that he took care of his personal needs, performed limited household chores, and occasionally went to church." Frankenfield, 861 F. 2d at 408. Very recently, the U.S. Court of Appeals for the Eighth Circuit stated that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant

13

can perform full-time competitive work." Swope v. Barnhart, 436 F. 3d 1023, 1026, n. 4 (8th Cir. 2006), quoting Hogg v. Shalala, 45 F. 3d 276, 278 (8th Cir. 1995). Although the ALJ faulted Plaintiff for cancelling some of his physical therapy sessions, there is some evidence in Dr. Demby's treatment notes that physical therapy may have aggravated Plaintiff's condition. (R. 17, 99). The ALJ mentioned some findings recorded by a few of the specialists who examined Plaintiff, but he never explained why he found any of these findings to be inconsistent with the restrictions placed on Plaintiff in both of Dr. Demby's Physical Capacity Evaluation forms. (R. 16-17).

Finally, Plaintiff contends that the ALJ improperly disregarded the testimony of the vocational expert, and relied on the answer to an incomplete hypothetical question, to find that Plaintiff was not statutorily disabled. (Br. for Plaintiff 16). In Ramirez v. Barnhart, 372 F. 3d 546 (3d Cir. 2004), the Court of Appeals described the two basic requirements regarding a hypothetical question posed to a vocational expert. The first requirement is that a "hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments.'" Ramirez, 372 F. 3d at 554 (emphasis in original), citing Chrupcala v. Heckler, 829 F. 2d 1269, 1276 (3d Cir. 1987). The second requirement is that "'great specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." Ramirez, 372 F. 3d at 554-555, citing Burns v. Barnhart, 312 F. 3d 113, 122 (3d Cir. 2002).

In the instant case, the ALJ found Plaintiff to be limited to a range of light work not requiring overhead reaching, the frequent pushing and pulling of arm controls, or the frequent use of his arms for lifting and carrying. (R. 15). Dr. Reed testified that someone with these limitations could work as a driver, usher, guide or security guard. (R. 322-323). Dr. Reed's testimony also established that these jobs existed in significant numbers in the national economy. (R. 322-323). Nevertheless, when asked by the ALJ whether his answer would have been different if the same hypothetical employee, in an 8-hour workday, had to lie down for three hours, could only sit for three hours, and could only stand for two hours, Dr. Reed testified that those conditions would have changed his answer. (R. 323). The ALJ asked Dr. Reed to assume that the same hypothetical employee could sit or stand for the entire day, but that he would be

absent from work for one day each week. (R. 323). Dr. Reed testified that such a degree of absenteeism would have been "well beyond the employer tolerance," which he described as the rough equivalent of one absence per month. (R. 323).

It is clear from Dr. Reed's testimony that the limitations recorded in both of Dr. Demby's Physical Capacity Evaluation reports, if added to the hypothetical question posed to Dr. Reed by the ALJ, would have made a dispositive difference at the fifth and final stage of the sequential evaluation process. The Commissioner bears the burden of proof at the fifth stage. Allen v. Barnhart, 417 F. 3d 396, 401, n. 2 (3d Cir. 2005). This Court is mindful of the fact that an ALJ may reject an occupational limitation if there is sufficient conflicting evidence in the record to refute it. Rutherford v. Barnhart, 399 F. 3d 546, 554 (3d Cir. 2005). Nonetheless, in the instant case, it is not clear that the conflicting evidence in the record was sufficient to justify the ALJ's rejection of Dr. Demby's findings. Dr. Demby's March 26, 2003, report was never even mentioned by the ALJ. It is impossible for this Court to determine whether the ALJ considered the cumulative effect of Dr. Demby's findings, and to what extent those findings were outweighed by the agency medical expert's report. Furthermore, the ALJ incorrectly attributed the hypothetical questions containing additional limitations to Plaintiff's attorney, even though the record clearly establishes that those questions were asked by the ALJ himself. (R. 18, 323). Given the imprecision reflected in the ALJ's decision and the dispositive nature of the unanswered questions, this Court is not prepared to say that the Commissioner's findings of fact in this case are "supported by substantial evidence" for purposes of 42 U.S.C. § 405(g).

While the Commissioner may not be obligated to give Dr. Demby's opinion controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2), it is clear that she must fulfil her duty to evaluate that opinion under 20 C.F.R. § 404.1527(d)(2)(i)-(d)(6). The Commissioner is also obliged to "give good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(d)(2). The ALJ did not do so in the instant case.

In Rutherford v. Barnhart, 399 F. 3d 546 (3d Cir. 2005), the Court of Appeals declared that "limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible." Rutherford, 399 F. 3d at 554. The Court went on

15

to state that "the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it." Rutherford, 399 F. 3d at 554.  On remand, the Commissioner must give adequate consideration to the entire record in this case, including the consistency in Dr. Demby's opinion from March 26, 2003, to June 25, 2004.  If Dr. Demby's opinion is found to be credible, the limitations expressed therein must be fully considered at the fifth and final stage of the sequential evaluation process.  Only then will the adjudication of this case be in conformity with the controlling statutes, regulations and precedents.

The ALJ's conclusion that Plaintiff was not statutorily disabled is not supported by substantial evidence.  Accordingly, Plaintiff's motion for summary judgment will be granted and the Commissioner's motion for summary judgment will be denied.  The Commissioner's decision below is reversed, and the case is remanded for further proceedings consistent with this opinion.

## V.     CONCLUSION

Based on the foregoing, the motion for summary judgment filed by Plaintiff shall be granted.  The motion for summary judgment filed by the Commissioner shall be denied.  An appropriate order will follow.

                                                      s/ David Stewart Cercone
                                                     David Stewart Cercone
                                                     United States District Judge

cc:     Christine M. Nebel, Esquire
       220 South Washington Street
       Butler, Pennsylvania 16001

       Rebecca Ross Haywood
       Assistant United States Attorney